**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| The Chefs' Warehouse Inc., | Case No.: 20-cv-4825 |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | **1) DECLARATORY JUDGMENT**<br>**2) BREACH OF CONTRACT** |
| Liberty Mutual Insurance Company and<br>Employers Insurance Company of Wausau, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff The Chefs' Warehouse Inc. ("Chefs' Warehouse"), by its undersigned counsel, brings this action against Defendants Liberty Mutual Insurance Company and Employers Insurance Company of Wausau (collectively, "Liberty Mutual"), and in support thereof, alleges as follows:

## NATURE OF ACTION

1.   This action arises out of Liberty Mutual's denial of coverage under an "all-risk" insurance policy for business interruption losses.  Chefs' Warehouse submitted a claim for business interruption and other covered losses arising in connection with the novel coronavirus and ongoing COVID-19 pandemic, but Liberty Mutual denied coverage within days and without any investigation or at least a reasonable one.

2.   Chefs' Warehouse seeks damages for breach of contract against Liberty Mutual for its failure to honor its policy obligations.  Chefs' Warehouse also seeks a judgment declaring the scope of Liberty Mutual's obligation to pay Chefs' Warehouse's losses under the "all risk" insurance policy that Liberty Mutual sold to Chefs' Warehouse.

## PARTIES

3.     Chefs' Warehouse is a corporation incorporated under the laws of the state of Delaware and maintains its principal place of business in Connecticut.

4.     Liberty Mutual Insurance Company is a Massachusetts corporation with its principal place of business in Boston, Massachusetts, and doing business in the State of New York. Upon information and belief, Liberty Mutual Insurance Company is a wholly-owned subsidiary of Liberty Mutual Holding Company Inc.

5.     Employers Insurance Company of Wausau is a Wisconsin corporation with its principal place of business in Wisconsin, and doing business in the State of New York. Upon information and belief, Employers Insurance Company of Wausau and Liberty Mutual Insurance Company share the same parent company, Liberty Mutual Holding Company Inc.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this district.

## BACKGROUND

1.     CHEFS' WAREHOUSE

8.     Chefs' Warehouse is a family operated specialty food distributor to key culinary markets across the United States and in Canada.

9.     For over 35 years, Chefs' Warehouse has been purveying specialty ingredients to over 35,000 high end independently owned restaurants, fine dining establishments, country clubs,

hotels, caterers, culinary schools, bakeries, patisseries, chocolatiers, cruise lines, casinos, and specialty food stores.

10.  Chefs' Warehouse's product portfolio includes specialty food products, such as artisan charcuterie, specialty cheeses, unique oils and vinegars, truffles, caviar, chocolate, and pastry products.  The company also offers a line of "center-of-the-plate" products, including custom cut beef, seafood, and hormone-free poultry, as well as food products, such as cooking oils, butter, eggs, milk, and flour.

11.  Chefs' Warehouse is comprised of a family of companies, including:  Dairyland USA; Michael's Finer Meats; Allen Brothers; Del Monte Meat Company; Ports Seafood; Fells Point Wholesale Meats; Bassian Farms; Wabash Seafood; Cambridge Packing Company; and Sid Wainer & Son.

12.  Together with its family of companies, Chefs' Warehouse serves some of the country's finest restaurants owned by leading chefs like Thomas Keller, Jean-Georges Vongerichten, Eric Ripert, Missy Robbins, Michael Mina, Nancy Silverton, Dan Barber, Daniel Boulud, and Jose Andres.  It also distributes to some of the world's most luxurious hotels, including The Ritz Carlton, MGM Resorts International and Four Seasons Hotels and Resorts.

13.  As part of its prudent business practices, Chefs' Warehouse maintains insurance coverage.  Specifically, Chefs' Warehouse maintains an "all-risk" policy with Liberty Mutual, covering common risks like fire, and also entirely unknown and novel risks, like COVID-19.  As described in more detail below, the Liberty Mutual policy provides coverage for "all risks of direct physical loss or damage" unless explicitly "excluded or limited" in the policy.  The loss suffered by Chefs' Warehouse was not explicitly excluded and thus is a covered loss under the Policy.

2.    THE COVID-19 GLOBAL PANDEMIC

14.    COVID-19 is an infectious disease known as the "novel coronavirus" or SARS-CoV-2.  It is believed that the first instance of the disease spreading to humans was in or around December 2019, in Wuhan, Hubei Province, China.  In an unprecedented event that has not occurred in more than a century, a pandemic of global proportions then ensued.

15.    In January 2020, COVID-19 reached the United States and quickly spread across the country.  As early as February 26, 2020, the Center for Disease Control and Prevention ("CDC") advised that COVID-19 was spreading freely without the ability to trace the origin of new infections, also known as community transmission.

16.    The rapid spread of COVID-19 is due in part to its highly contagious character.  For example, as of March 1, 2020 there were 42,198 confirmed COVID-19 cases across the globe.  That number increased to 747,899 confirmed cases in April and 2,421,669 cases in May. *See* https://graphics.reuters.com/CHINA-HEALTH-MAP/0100B59S39E/index.html.

17.    According to the CDC, "everyone is at risk for getting COVID-19."  A person may become infected by: (1) coming into close contact (about 6 feet) with a person who has COVID-19; (2) respiratory droplets when an infected person talks, sneezes, or coughs; and/or (3)  touching unclean surfaces or objects, and then by touching his or her mouth, eyes, or nose.  *See* https://www.cdc.gov/coronavirus/2019-ncov/faq.html.

18.    A particular challenge with COVID-19 is that it is possible for a person to be infected with the disease, but be asymptomatic.  *Id.*  In fact, at least 44% of all infections occur from people without any symptoms.  *See* https://www.nature.com/articles/s41591-020-0869-5.

19.    Studies from the National Institutes of Health support that COVID-19 may be detected in aerosols for up to three hours, on plastic and stainless steel for up to three days, and on

cardboard for twenty-four hours.   *See*   https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days.

20.     While infected droplets and particles carrying COVID-19 may not be visible to the naked eye, they are physical objects that travel to other objects and cause harm.

21.     Restaurants are particularly vulnerable breeding grounds for the spread of COVID-19.  A recent article, soon to be published by the Centers for Disease Control and Prevention, analyzed a case study of three families (families A, B, and C) who had eaten at an air-conditioned restaurant in Guangzhou, China.   *See*  https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article. One member of family A, patient A1, had recently traveled from Wuhan, China.  On January 24, 2020, that family member ate at a restaurant with families A, B, and C.  By February 5, 2020, 4 members of family A, 3 members of family B, and 2 members of family C had become ill with COVID-19.  *Id.*  The only known source for those affected persons in families B and C was patient A1 at the restaurant.

22.     At present, testing remains limited and the accuracy of tests are in doubt. Approximately 1.6 million people are confirmed to have been or are infected with COVID-19. And there have been over 117,000 deaths due to COVID-19 to date.

23.     The CDC keeps track of known infections by county.  The major metropolitan areas that Chefs' Warehouse services have reported numerous COVID-19 infections, including New York City, Northern and Southern California, Chicago, and Washington, D.C., to name a few.

**3.      THE NATIONAL, STATE AND LOCAL RESPONSE**

24.     On January 30, 2020, with the outbreak spreading outside of China, impacting many countries including the United States, the World Health Organization ("WHO") declared the COVID-19 outbreak a Public Health Emergency of International Concern.

25.     Beginning in late-February 2020, U.S. state and local governments issued orders of civil authority suspending or severely curtailing the operations of all "non-essential" businesses in response to COVID-19.

26.     On March 11, 2020, the WHO officially declared the COVID-19 outbreak a worldwide pandemic.

27.     On March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidelines to the American public (titled "30 Days to Slow the Spread") to slow the spread of COVID-19.   The guidelines advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding gatherings of more than ten people, and avoiding eating or drinking in restaurants.

28.     In or around mid-March 2020, state and local governments across the country recognized the unprecedented and catastrophic situation, making "state of emergency" declarations in early March 2020.   Simultaneously, or shortly thereafter, states across the country issued orders encouraging or requiring citizens to "shelter in place" or "stay at home."   These "stay at home" orders were issued in the major markets that Chefs' Warehouse services, including New York City, Southern and Northern California, Chicago and Washington, D.C., to name a few.

(a)     **New York**

29.      On March 7, 2020, New York Governor Andrew Cuomo declared a Disaster Emergency for the entire state of New York as a result of COVID-19.

30.     On March 16, 2020, the Mayor of New York City, Bill de Blasio, issued an order requiring that all restaurants, bars and cafes close until further notice specifically because COVID-19 "physically is causing property loss and damage."

31.     On March 20, 2020, Governor Cuomo issued a stay-at-home order that required all "non-essential" businesses to close as a result of the COVID-19 pandemic.   This included

restaurants, hotels and caterers, among other "non-essential" businesses that are customers of Chefs' Warehouse.

(b)   **California**

32.   On March 4, 2020, the Governor of the State of California, Gavin Newsom, declared a state of emergency in California to help the state prepare for broader spread of COVID-19.

33.   On March 15, 2020, California Governor Newsom issued a statewide order requiring restaurants to reduce their occupancy by fifty percent to create space between diners.

34.   That same day, the Mayor of Los Angeles, Eric Garcetti, issued an emergency order prohibiting all Los Angeles restaurants from serving food for consumption on premises and bars from serving alcohol.  The Order only allowed restaurants to continue to operate for purposes of preparing and offering food to customers via delivery service, to be picked up, or for drive-thru.

35.   On March 19, 2020, California Governor Newsom issued a statewide "Stay At Home" Order, requiring all California residents to stay home or at their place of residence.

36.   That same day, Los Angeles Mayor Garcetti issued a "Safer At Home" Order, adopting additional emergency measures to further limit the spread of COVID-19.  The Order required Los Angeles residents to isolate themselves in their residences and the continued closure of restaurants (with the exception of takeout, delivery, and drive-thru service).  The Los Angeles County Department of Health also issued an order on March 19, 2020 prohibiting all indoor public and private gatherings and all outdoor public and private events within a confined space, where at least ten people are expected to be in attendance at the same time.

37.   On April 10, 2020, Los Angeles Mayor Garcetti issued a revised "Safer At Home" Order, adopting additional emergency measures to further limit the spread of COVID-19, including new social distancing protocols for individuals and businesses and requiring the

continued closure of restaurants (with the exception of takeout, delivery, and drive-thru service). The Order specifically states it is being issued because COVID-19 "is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time."

38.     Other California county and city officials have issued similar orders declaring that COVID-19 causes and has caused or imminently threatens physical loss or damage to property and human health.

39.     For example, on March 18, 2020, the health officer of Napa County, Karen Relucio, issued an order requiring residents to stay at home and all non-essential businesses to "cease all activities at facilities located within the County, except Minimum Basic Operations […]."  The Order states it is being issued based on evidence of COVID-19's "proclivity to attach to surfaces and cause temporary physical damage to property."

40.     On March 27, 2020, the Mayor of San Francisco, London Breed, issued a "Sixth Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated February 25, 2020", which states it is being issued because COVID-19 "is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time."

41.     On March 31, 2020, the health officer of Sonoma County, Dr. Sundari Mase, issued an order clarifying, strengthening, and extending certain terms of the county's prior "Shelter in Place" Order.  The Order states it is being issued because COVID-19 "is causing property loss or damage due to its proclivity to stay airborne and to attach to surfaces for prolonged periods of time."

(c)     **Illinois**

42.     On March 15, 2020, Illinois Governor, Jay Robert Pritzker, issued an order requiring that all businesses in the State of Illinois that offer food or beverages for on-premises

consumption, including many customers of Chefs' Warehouse, must suspend service for and may not permit on-premises consumption.

(d)   **Washington, D.C.**

43.   On March 30, 2020, Mayor Muriel Bowser issued a stay-at-home order for the District of Columbia. This order required all non-essential businesses, including many customers of Chefs' Warehouse, to close.

44.   The shut-down civil authority orders issued by the above-mentioned  state and local authorities covering non-essential businesses in these states and counties are similar to civil authority orders that have been issued nationwide by other state and local civil authorities.  *See* https://www.wsj.com/articles/a-state-by-state-guide-to-coronavirus-lockdowns-11584749351.

45.   The civil authority orders issued by various state and local authorities across the country evidence an awareness that COVID-19 causes physical loss or damage to property.  This is especially true in the states and counties that issued civil authority orders explicitly based on the belief that COVID-19 causes physical loss or damage to property including orders from the major markets that Chefs' Warehouse services.  Attached as **Exhibit B** is a list of certain civil authority orders that shut down Chefs' Warehouse's business and that of its direct and indirect customers in the major markets that it services.

46.   As a result of the COVID-19 pandemic and/or government shut-down orders, Chefs' Warehouse has suffered physical loss or damage covered by Liberty Mutual's policy.

**4.   THE LIBERTY MUTUAL PREMIER PROPERTY PROTECTOR™ POLICY**

47.   In exchange for a very substantial premium, Liberty Mutual agreed to indemnify Chefs' Warehouse for property losses, business interruption losses ("Time Element" per the policy language), and other losses under its Premier Property Protector™ policy, policy number YAC-L9L-469301-019, effective from August 1, 2019 to August 1, 2020 (the "Policy").  A true and

correct copy of the Policy is attached as **Exhibit A**.  The Policy limit is $75 million, which is subject to a deductible and certain sublimits.

48.     When marketing its Premier Property Protector™ policy to the public, Liberty Mutual boasted that this new policy form featured "flexibility, broad coverage, and more relevant capacity in one easy-to-use form."  Mike Fallon, the then president of National Insurance, Liberty Mutual's business unit, stressed that "[t]he Premier Property Protector form blends broad coverage, an intuitive structure and easy to understand language . . . ."  *See* https://www.prnewswire.com/news-releases/liberty-mutual-insurance-launches-enhanced-commercial-insurance-property-form-300501115.html.

49.     This is because the Premier Property Protector™ policy generally, and the Chefs' Warehouse Policy in particular, is an "all-risk" policy.  An "all-risk" policy provides the broadest coverage available.   Under an "all-risk" policy, the policyholder's burden is limited; the policyholder need only show that a loss occurred and that the loss was fortuitous.  The burden then shifts to the insurance company to show that an express exception in the policy bars or limits coverage.  Any risk not specifically and unambiguously excluded in the policy is covered.

50.     The Policy broadly covers property against "all risks of direct physical loss or damage, except as hereinafter excluded or limited."  Ex. A, § I.A.  Liberty Mutual did not define the phrase "physical loss or damage" in its Policy.

51.     The presence of the disjunctive "or" in "physical loss or damage" means that coverage is triggered if there is a risk of **either** a direct physical "loss" **or** "damage" to property. It also means that a "loss" is distinct from "damage."

52.     Physical loss or damage to property happens  when a covered cause of loss threatens to render or renders property unusable,  unsuitable for its intended purpose, or unsafe for human occupancy and/or continued use.

53.     COVID-19 and/or the government shut-down orders described above have caused "direct physical loss or damage" to Chefs' Warehouse's property under the Policy.  Specifically, Chefs' Warehouse has suffered a loss of inventory that it was unable to sell to customers that were ordered to close, as well as gross earnings and rebates that it otherwise would have received if the volume of food orders did not diminish significantly.

54.     The Policy contains a section entitled "Time Element Coverages" which insures Chefs' Warehouse's gross earnings.  Within that section, coverage is extended for "Extra Expense" which covers the reasonable and necessary extra costs to "temporarily continue as nearly normal as practicable" business operations.

55.     The Policy also contains additional "Time Element Coverages."  This includes items such as:  "Attraction Property"; "Civil or Military Authority"; "Ingress/Egress"; and "Contingent Time Element."

56.     "Attraction Property" covers actual loss and Extra Expense due to loss or damage at an attraction property within one statute mile from a covered location.  "Attraction Property" refers to a property operated by others and that Chefs' Warehouse depends on to attract customers to its covered location.

57.     "Civil or Military Authority" coverage insures the "actual loss sustained and EXTRA EXPENSE during the period of interruption if an order of civil or military authority prohibits access to a covered location provided such order is caused by physical loss or damage of

the type insured by this Policy at a covered location" or within one statute mile from a covered location.

58.     "Ingress/Egress" covers the "actual loss sustained and EXTRA EXPENSE due to the necessary interruption" of business operations "if ingress to or egress from a covered location is prevented" regardless of whether the premises or property is damaged, provided that such prevention is a direct result of physical loss or damage of the type insured to property of the type insured.

59.     "Contingent Time Element" coverage insures the "actual loss sustained and EXTRA EXPENSE during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured by this Policy at *Direct Dependent Time Element **Location(s)*** and *Indirect Dependent Time Element **Location(s)*** located within the territory of this Policy."  *"Direct Dependent Time Element Location(s)"* includes any location(s) of a direct:  customer, supplier, contract manufacturer or contract service provider to Chefs' Warehouse.  "Independent Dependent Time Element Location(s)" includes any location(s) of any company that is a direct customer, supplier, contract manufacturer or contract service provider to any Direct Dependent Time Element Location(s).

60.     In plain English, the Policy provides coverage to Chefs' Warehouse if its direct or indirect customers (*i.e.*, its customers or customers' customers) suffer physical loss or damage to property of the type covered under the Policy.  This includes loss due to civil authority and ingress/egress.

61.     For example, as alleged above, national, state and local governments have issued orders closing restaurants, hotels and other "non-essential" businesses of the type that are customers of Chefs' Warehouse in order to control the spread of COVID-19, and specifically

because COVID-19 is causing physical loss or damage to property everywhere, including property within one mile of covered locations.  The Ritz Carlton, for example, has numerous restaurants on its properties that have been ordered to close as a result of various civil authority orders.  The closure of these restaurants means that they are no longer purchasing food from Chefs' Warehouse. As a result of these civil authority orders, Chefs' Warehouse has suffered and will continue to suffer Contingent Time Element losses covered under the Policy for not only the closure of Ritz Carlton hotels and the restaurants therein, but all other "non-essential" businesses that Chefs' Warehouse services.

62.     The Policy also provides coverage for "[a]ny shortage in the collection of accounts receivable." As a result of COVID-19 and/or the civil authority orders described above, many customers of Chefs' Warehouse have been forced to close operations and likely will not survive. Chefs' Warehouse has millions of dollars in accounts receivable that it was unable to collect. Chefs' Warehouse already has written off approximately $16 million in accounts receivables.  As a result, Chefs' Warehouse has suffered and will continue to suffer loss due to uncollected accounts receivables.

63.     Direct physical loss or damage due to the continuous spread and transmission of COVID-19 and the above-referenced civil authority orders are covered causes of loss not otherwise excluded under Liberty Mutual's all-risk Policy.

64.     The Policy contains an exclusion for "contamination" but it is limited in scope and does not apply here.

65.     Specifically, the "contamination" exclusion provides:

**We** do not cover the following unless directly resulting from a **covered loss**:

    a.  **Contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided elsewhere in this Policy.

66.    The Policy defines "covered loss" as "loss to covered property caused by direct physical loss or damage insured by this Policy."  Ex. A, § VII.5.

67.    "Contamination" is defined as "[a]ny condition of property that results from a **contaminant**."  Ex. A, § VII.4.  "Contaminant" is "[a]ny foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew."  *Id.,* § VII.3.

68.    On its face, the contamination exclusion applies only to **actual** "contamination" (not the threatened presence of contamination) and any "**cost**" due to actual contamination (not any "loss" or "damage" due to the threatened presence of or actual contamination).

69.    The contamination exclusion also does not apply to concurrent causes of loss.  Concurrent causation occurs when a loss is brought about through a combination of two or more potential causes.  If one of the concurrent causes is covered, there is coverage under the Policy.  If Liberty Mutual intended for the contamination exclusion to apply to concurrent causes of loss, then it should have said so like it did in other exclusions.  *See, e.g.*, Ex. A, § II.C.2. ("We do not cover physical loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing to the loss concurrently or in any other sequence").

70.    The Policy's contamination exclusion does not apply here for at least the following reasons.

71.    First, the contamination exclusion requires the actual presence of a virus, and it was the threatened presence of COVID-19 and the civil authority orders (that were issued because the threatened presence of COVID-19 could cause direct physical loss or damage to property) that

caused loss or damage to Chefs' Warehouse, not the actual presence of any virus at any covered location.

72.     Second, the contamination exclusion precludes coverage only for any "cost" due to actual contamination, not "loss" or "damage" due to actual or the threatened presence of contamination.  The Policy clearly distinguishes between "cost" and "loss" and "damage."  If Liberty Mutual intended for this exclusion to preclude coverage for direct physical "loss" or "damage" due to contamination, then it should have said so like it did in other Policy exclusions it drafted.  *See, e.g.*, Ex. A, § II.C.2 ("**We** do not cover physical **loss** or **damage** directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing to the loss concurrently or in any other sequence . . . ."); *see also id.*, § II.C.1.d ("We do not cover . . . **[l]oss** or **damage** or deterioration arising from any delay."); *id.*, §II.C.1.f ("We do not cover . . . **[l]oss** or **damage** from enforcement of any law or ordinance . . . [r]equiring the demolition of any property, including the **cost** in removing its debris.").  At a minimum, the Policy's contamination exclusion is ambiguous and should be construed against Liberty Mutual as the sole drafter of its Policy and in favor of the policyholder, Chefs' Warehouse.

73.     The fact Liberty Mutual even decided to include an exclusion for actual contamination (like a virus) demonstrates that Liberty Mutual recognizes actual contamination (like a virus) can in fact cause direct physical loss or damage to property.

74.     Third, there are concurrent causes of Chefs' Warehouse's loss, and the contamination exclusion, by its express terms, does not apply to one of them.  Thus, even if Chefs' Warehouse's loss somehow is determined to be due to a virus, the above-mentioned civil authority orders were a concurrent cause of loss that are covered under the Policy.  If Liberty Mutual wanted

the contamination exclusion to apply to concurrent causes of loss, then it knew how to exclude them, but it decided not to do so.

5.   **CHEFS' WAREHOUSE SUFFERED AND CONTINUES TO SUFFER A COVERED LOSS**

75.   COVID-19 and the civil authority orders have caused and continue to cause direct physical loss or damage to Chefs' Warehouse and its direct and indirect customers because Chefs' Warehouse's property and the property of its direct and indirect customers has lost functionality and/or been rendered unusable for their intended purpose, and/or unsafe for normal human occupancy or continued use.

76.   Chefs' Warehouse has suffered and will continue to suffer Time Element losses, including additional Time Element losses for Civil Authority and Contingent Time Element, among other losses.

77.   Among other losses, Chefs' Warehouse has suffered and will continue to suffer a loss of inventory, gross earnings, rebates that it otherwise would have received if the volume of food orders did not diminish significantly, and uncollected accounts receivables that have been and will continue to be written off.  Chefs' Warehouse also has incurred and will continue to incur extra expense as the country moves toward reopening "non-essential" businesses.   Chefs' Warehouse expects that with the calculation of its full losses when better known, additional coverages under the Policy may be applicabe.

78.   For the foregoing reasons, Chefs' Warehouse has suffered and will continue to suffer direct physical loss or damage that is insured under the Policy.

6.   **CHEFS' WAREHOUSE'S CLAIM AND SATISFACTION OF CONDITIONS PRECEDENT**

79.   On Thursday, April 29, 2020, Chefs' Warehouse provided timely notice of its claim under the Policy to Liberty Mutual.

80.     The claim complies with or, at a minimum, substantially complies with, all applicable terms and conditions of the Policy and/or applicable law.

81.     Chefs' Warehouse has substantially performed or otherwise satisfied all conditions precedent to bringing this action and obtaining coverage under the Policy and applicable law, or alternatively, Chefs' Warehouse has been excused from performance by Liberty Mutual's acts, representations, conduct and/or omissions.

## 7.     LIBERTY MUTUAL'S IMPROPER DENIAL

82.     On May 4, 2020, only three business days after receiving notice of Chefs' Warehouse's claim, Liberty Mutual denied the claim in full without conducting any investigation whatsoever.

83.     In its denial letter, Liberty Mutual concluded:  "The Time Element coverages available under your policy requires physical damage by a peril insured against."  Liberty Mutual fails to explain, however, where in the Policy it requires "physical damage."  As discussed above, the insuring agreement covers against all risks of direct physical "**loss**" *or* "damage" unless explicitly excluded, and the Policy expressly distinguishes between "loss" and "damage."

84.     In its denial letter, Liberty Mutual also concluded:  "The civil or military authority coverage also requires the order to be caused by physical loss or damage by a peril insured against. As there was no physical damage and contamination is an excluded peril, there is no coverage provided for your business interruption loss."

85.     Again, Liberty Mutual mistakenly concludes that the Policy covers only "physical damage"; it also covers "loss" which is different than "damage."  Liberty Mutual also ignores that many civil authority orders were concurrent causes of loss and issued explicitly based on the belief that COVID-19 causes physical loss or damage to property.

86.     Finally, Liberty Mutual concludes without explanation that "contamination is an excluded peril"; but none of the loss was due to actual contamination and, in any event, the contamination exclusion at best only applies to any "cost" due to a virus (not "loss" or "damage" due to a virus).

87.     Given the timing of the denial, no investigation into the claim was conducted at all. Consequently, by failing to raise any other bases for denial of coverage in its premature denial letter, Liberty Mutual waived or should be estopped from asserting any additional grounds to contest this claim.

88.     As a result of Liberty Mutual's wrongful denial of coverage in breach of the Policy, Chefs' Warehouse has suffered damage and will continue to suffer damage.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment)**

89.     Chefs' Warehouse incorporates by reference the allegations contained in paragraphs 1-88.

90.     As set forth above, Liberty Mutual sold Chefs' Warehouse the Policy protecting against all risks of direct physical loss or damage to property and time element coverages now being suffered by Chefs' Warehouse as a result of COVID-19 and recent orders of civil authority that closed the premises of Chefs' Warehouse's direct and indirect customers.

91.     Liberty Mutual breached and continues to breach its promises, as set forth in the Policy, by, among other things, failing and/or refusing to honor its promises to pay for loss or damage to property and time element coverages now being suffered by Chefs' Warehouse as a result of COVID-19 and recent orders of civil authority.

92.     As a direct and proximate result of Liberty Mutual's breaches of contract and refusal to acknowledge its coverage obligations, Chefs' Warehouse has suffered and will continue to suffer serious harm in an amount in excess of $75,000, exclusive of interest and costs.

93.     An actual and justiciable controversy exists between Chefs' Warehouse and Liberty Mutual regarding the interpretation, application and meaning of the Policy.

94.     Accordingly, Chefs' Warehouse is entitled to declaratory judgment of its rights and of the obligations of Liberty Mutual under the Policy.

95.     Declaratory relief from this Court will resolve all outstanding issues between Chefs' Warehouse and Liberty Mutual under the Policy.

WHEREFORE, pursuant to 28 U.S.C. §§ 2201-02, Chefs' Warehouse seeks judgment in its favor as to Count I as follows:

a)     Chefs' Warehouse suffered loss, damage and/or costs covered under the Policy;

b)     The Policy's contamination exclusion does not bar or limit coverage for the loss, damage and/or costs suffered by Chefs' Warehouse;

c)     COVID-19 and/or the entry of civil authority orders declaring that the suspected presence of COVID-19 causes physical loss or damage to property sufficient to trigger coverage under the Policy;

d)     The entry of an Order declaring that Liberty Mutual must pay Chefs' Warehouse the limits of liability for direct loss or damage to covered property, for the loss of income sustained by Chefs' Warehouse due to COVID-19 and the necessary suspensions of its direct and indirect customers' operations, for extra expenses, and for all additional coverages provided under the Policy; and

e)     The award of such additional relief as the Court deems just and appropriate.

**SECOND CAUSE OF ACTION**
**(Breach of Contract)**

96.     Chefs' Warehouse incorporates by reference the allegations contained in paragraphs 1-95.

97.     Chefs' Warehouse has incurred, and will incur in the future, loss of income, Extra Expenses and other covered loss or damage due to COVID-19 and orders of civil authority that closed operations for Chefs' Warehouse's direct and indirect customers.

98.     In breach of the Policy, Liberty Mutual refused or otherwise failed to recognize any coverage afforded for Chefs' Warehouse's loss, damage and/or costs, thereby causing damage to Chefs' Warehouse.

WHEREFORE, Chefs' Warehouse seeks judgment in their favor as to Count II as follows:

a) The entry of an award requiring Liberty Mutual to pay Chefs' Warehouse all monetary damages suffered by Chefs' Warehouse caused by Liberty Mutual's breaches, including, without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and attorneys' fees and costs; and

b) The award of such additional relief as the Court deems just and appropriate.

Respectfully submitted,

Dated: June 23, 2020                    REED SMITH LLP


By:_____s/John N. Ellison_____
    John N. Ellison
    599 Lexington Avenue
    New York, NY 10022
    T:  (212) 521-5400
    F:  (212) 521-5450
    jellison@reesmith.com
    *Attorneys for Plaintiff*

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues properly so tried.


Dated: June 23, 2020     REED SMITH LLP


           By:_____s/John N. Ellison_____
             John N. Ellison
             *Attorneys for Plaintiff*